**HAMMERHEAD ENTERPRISES, INC., Ronald Pramschufer, and Robert Johnson, Plaintiffs-Appellants,**

v.

**Stanley BREZENOFF, Mayor and City Council, and the City of New York, Defendants-Appellees.**

**No. 1111, Docket 83–7014.**

United States Court of Appeals, Second Circuit.

Argued April 7, 1983.

Decided April 28, 1983.

David Tichane, New York City (Luther C. West, West, Carey, Frame & Barnstein, Baltimore, Md., of counsel), for plaintiffs-appellants.

Arnold Stream, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel, Francis F. Caputo, George Gutwirth, New York City, of counsel), for defendants-appellees.

Before KAUFMAN and NEWMAN, Circuit Judges, and LASKER, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

Social and political satire have long held a prominent place in the American literary landscape. From the witticisms of Benjamin Franklin to the pungent rhetoric of H.L. Mencken, our nation has been blessed with skilled linguistic craftsmen whose barbs and aphorisms have shaped the course of public debate. Nor have words provided the only medium for biting criticism of establishment shibboleths. Filmmakers like Preston Sturges have lambasted our most sacred institutions and modern newspaper readers daily have taken delight in the trenchant cartoons of Garry Trudeau. Appellants, creators of a board game titled "Public Assistance—Why Bother Working for a Living" ("Public Assistance"), purport to be heirs to this grand tradition.

Public Assistance, fashioned in the style of Monopoly and similar adult parlor games, lampoons what appellants might label the "welfare bureaucracy." In their view, the game, which we shall later describe in detail, serves to inform the public of the wasteful and fraudulent nature of our system of distributing funds to deprived and disabled individuals. Others proffer a different outlook. Patricia Harris, former Secretary of the U.S. Dept. of Health and Human Services, for example, characterized the game as "vicious" and based on "false stereotypes that are callous, sexist, and racist." Similarly, appellee Stanley Brezenoff, Administrator of the Human Resources Administration of the City of New York, portrayed appellants as having launched "an ugly and damaging slam at this society's poorest citizens."

Our task, of course, is not to evaluate these competing perspectives. For it is beyond peradventure that regardless of our view of the wisdom and taste of appellants' creation, their right to market the game is protected by the First Amendment. This Court has repeatedly made clear that suppression of even the most unpopular or hateful ideas can have no place in a democratic society which depends upon an informed citizenry to exercise the precious right of self-government. *See Federal*

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

*Election Commission v. Hall-Tyner Election Campaign Committee,* 678 F.2d 416 (2d Cir. 1982), *cert. denied,* — U.S. —, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983); *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977); *see also International Society for Krishna Consciousness Inc. v. Barber,* 650 F.2d 430 (2d Cir.1981), *vacated and remanded on rehearing,* 672 F.2d 900 (2d Cir.1981) (unpublished order).

█ This case, however, does not involve attempts by government to censor the unorthodox or the insurgent. Rather appellants ask us to protect them against a letter sent by Brezenoff simply urging various department stores not to carry the controversial product. Apparently, appellants believe the First Amendment shields their own critique from any form of official criticism. In our view, this approach would stand the Constitution on its head. The right to free speech guarantees that every citizen may, without fear of recrimination, openly and proudly object to established government policy. It does not immunize the challengers from reproach. Having boldly entered the flames of public discussion the First Amendment specifically is designed to kindle, appellants now seek our rescue from the sparks of controversy they ignited. In the absence of any evidence that Brezenoff or any New York City official attempted to do more than express his view concerning the distasteful nature of appellants' invention, we decline to come to their assistance. Accordingly, for the reasons stated below, we affirm the judgment of the district court dismissing appellants' complaint alleging violation of their First Amendment rights and other related injuries.

## I

The public controversy surrounding appellants' satirical creation provides a sterling example of the "robust debate" which lies at the core of the First Amendment. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720–721, 11 L.Ed.2d 686 (1964). Because a complete understanding of this nationwide dispute and the game which provoked it are necessary to a proper disposition of this appeal, we set forth the underlying facts in some detail.

In the summer of 1980, Robert Johnson, an author and publisher, and Ronald Pramschufer, a printer with production and sales experience, concocted "Public Assistance— Why Bother Working for a Living." The game is played by rolling dice and moving pawns twelve times around the board, each trip representing a month of the year. Players attempt to accumulate as much money as possible as they proceed along two routes: the inside track, labeled the "Able Bodied Welfare Recipient's Promenade," and the outer circuit, designated "the working person's rut." As a reflection of appellants' view of the nation's welfare system, financial rewards come more quickly and easily to contestants traveling the inner circle. Indeed, Public Assistance seeks to present a striking contrast between the easy life allegedly enjoyed by recipients of public funds and the numerous obstacles purportedly confronting employed citizens. The game's working people are made to appear burdened by oppressive taxes, strangled by government regulations, and victimized by reverse discrimination. Conversely, those receiving welfare benefits are portrayed as lazy, dishonest and in some cases intoxicated and promiscuous individuals who take unfair advantage of government largesse. These players may procure additional monies by obtaining the assistance of an "ethnic lawyer" and by landing on squares marked "have an illegitimate child." Government officials who distribute funds are similarly depicted as lazy, tolerant of fraud, and easily duped by dishonest claimants. In sum, the game mocks the entire system of public assistance this country has worked so hard to perfect.

Having completed the game's design, Pramschufer and Johnson began devising a strategy to produce and market the new product. Together they formed Hammerhead Enterprises, Inc., a Maryland Corporation, which by the fall of 1980 had secured

financing and commenced manufacturing the first copies of Public Assistance. At the same time, the young entrepreneurs took steps to ensure that sales of the game which retailed for $15.95 would not depend upon mere word of mouth. They quickly contacted their local newspaper, the Annapolis Evening Capitol, and succeeded in obtaining an article describing their controversial creation and detailing the negative reactions of a local community agency representative. In light of the inflammatory nature of the game, it should come as no surprise that this initial effort to garner publicity soon resulted in the widespread media attention appellants so evidently desired.

The column in the Maryland paper was observed by the Associated Press which disseminated the story nationally during September and October of 1980. Pramschufer and Johnson, displaying no reluctance to highlight the game's outlandish nature, became regular guests on radio talk shows, appearing at least a dozen times closely following the AP report. In addition, Public Assistance was featured by Phil Donahue on the Today Show which invited Johnson to defend the game on network television.

Negative reactions were intense and immediate as outraged spokesmen for impoverished citizens entered the debate. Carl Snowden, a leader of a local anti-poverty group in Annapolis, joined Johnson on the Today Show where Snowden denounced the game. The National Organization of Women, which condemned the game for "perpetuat[ing] myths and totally misrepresent[ing] the role of women on welfare," urged its members to take action against this form of amusement. The Maryland NAACP also called for a boycott of merchants carrying Public Assistance. As a result of these protests, certain stores in the Baltimore-Washington area allegedly cancelled orders for the new game which appellants had begun shipping in late October and early November 1980.

Stanley Brezenoff, the Administrator of the Human Resources Administration of New York City ("HRA") also reacted unfavorably to Public Assistance when he first encountered the game at a Washington, D.C. social gathering in late October 1980. After examining the game, Brezenoff became deeply concerned over the distorted impression of the welfare system which, in his view, would be conveyed to the public by appellants' attempt at satire. As the New York City official primarily responsible for administering the HRA's annual $3 billion budget, Brezenoff had previously spoken on numerous occasions concerning the provision of financial assistance to the needy. He now viewed it as his duty to express his disagreement with appellants' disparaging characterizations of welfare recipients and chose to voice his opinion in a letter written on official stationery and mailed on November 5, 1980 to 13 New York department stores.[1] Brezenoff discussed his decision with no city officials other than his assistant, Ann Whalen, who aided in drafting the challenged communication, and an HRA staff attorney.

Brezenoff's letter, set forth in the margin,[2] urges the stores to refrain from carry-

---

1. The letter was sent to Abraham & Strauss; Alexander's; B. Altman & Co.; Bloomingdale's; Gimbels; Hammacher-Schlemmer; Lord & Taylor; Macy's; Saks Fifth Avenue; F.A.O. Schwarz; Brentano's; Barnes & Noble; and Toys-R-Us.

2. Brezenoff sent the following letter to the thirteen department stores and mailed a copy to Edward T. Weaver, executive director of the American Public Welfare Association, a private group attempting to thwart sales of the game:

Dear Mr. _____

As you may know, there is a new board game on the national retail market called "Public Assistance." I am writing to urge that _____ refrain from carrying this game in its stores.

"Public Assistance" is not, as its inventors claim, a harmless spoof of welfare cheats and liberal government bureaucrats. It is an ugly and damaging slam at this society's poorest citizens, 60 percent of whom are children.

A welfare family of four in New York City receives public assistance and food stamp benefits of $374 a month to cover everything —food, clothing, utilities, carfare, and the other necessities—except rent and medical care. That works out to about $3.01 per

ing Public Assistance. It lauds recent improvements in the administration and management of the welfare system, and elucidates the harsh reality that a NYC family of four receiving public assistance is forced to survive on a meager $374 per month (excluding rent and medical care). Brezenoff also expresses his opinion that appellants' creation "does a grave injustice to taxpayers and welfare clients alike." The letter closes with the exhortation, "Your cooperation in keeping this game off the shelves of your stores would be a genuine public service."

Brezenoff received two initial responses.[3] Monica Hollander of Brentano's wrote to express her store's "complete agreement" with Brezenoff's point of view, and to inform him that the store's buyer, Michael Botti, had decided before receiving Brezenoff's letter not to order Public Assistance. Peter Oechsle, President of F.A.O. Schwarz also sent a letter explaining that his store had rejected the game "several months ago."[4] Brezenoff took no further steps to trace the consequences of his correspondence. He did not investigate whether any merchants were in fact carrying the game nor did he contact any government agency which might have regulatory authority over New York department stores.[5] The HRA has no such administrative power.

Moreover, no credible evidence suggests that any store decided not to carry the game as a result of Brezenoff's letter. Michael Botti did initially testify that he had been influenced by Brezenoff's "strong request" when he decided not to order the controversial product. On cross-examination, however, he admitted that the November 13, 1980 letter sent by his superior, Monica Hollander, accurately informed Brezenoff that Brentano's had chosen not to sell Public Assistance before receiving Brezenoff's communication. In addition, Botti was unable to point to any language in the Brezenoff letter which he found threatening or coercive. Appellants also note that Macy's cancelled orders for the game it had placed prior to the 1980 Christmas season. The decision to cancel, however, may have been spurred by the continuing controversy in the press or by business reasons wholly unrelated to the Brezenoff letter. No Macy's official testified to explain the store's actions nor did representatives from any other merchant describe the choice each made not to carry the game.

Sincerely,

person per day. The maximum the family can receive for rent is $218 monthly.

Besides lampooning the painful financial situation of those who struggle to get by on that amount in this economy, the game also denigrates the very real progress over the past decade in reforming administration and management of the welfare system. Locally, error rates in payment and eligibility are now a fraction of what they were just seven years ago; caseloads are down to their lowest levels since 1972; and more able-bodied welfare recipients are being removed from the rolls and put to work in productive jobs than at any other time in the City's history.

The system is still imperfect, but we are working hard to improve it, and the "welfare mess" of the old days is gone.

By perpetuating outdated myths, I believe the "Public Assistance" game does a grave injustice to taxpayers and welfare clients alike; by its insensitivity and plain shoddiness, it is a discredit to those associated with its manufacture and marketing.

Your cooperation in keeping this game off the shelves of your stores would be a genuine public service.

With thanks and best wishes.

3. Subsequently, in March 1982, Brezenoff received a copy of a letter sent by Leonard Riggio, President of Barnes & Noble, to appellants' attorney, David Tichane. This correspondence revealed Riggio had read Brezenoff's November 5, 1980 letter and thrown it away.

4. Appellants correctly point out that their game had been on the market only a few weeks in November 1980 when F.A.O. Schwarz received the Brezenoff letter. Oechsle's exaggerated estimate of "several months," however, does not undermine the basic import of his letter that his store's decision not to carry Public Assistance was not influenced by the challenged communication.

5. Appellants' only allegation that Brezenoff invoked coercive government power is based on the unusual vigilance of New York fire inspectors during the 1980 Christmas season. No evidence, however, suggests Brezenoff ever communicated with fire department officials or that the inspectors singled out stores carrying the game.

The growing public controversy surrounding Public Assistance continued throughout the late fall of 1980. On November 30, 1980, the *New York Times* published an article describing the game and the negative responses it had provoked. Kathy Groudine, a struggling freelance writer, spotted the column and decided to write about the game for a Libertarian newspaper. In addition, the *New York Daily News* printed two stories concerning the game, the latter not only discussing the product but also mentioning the Brezenoff letter. In spite of all this publicity, or perhaps because of it, Hammerhead Enterprises sold 10,000 Public Assistance games during the 1980 Christmas season.

The *Daily News* article of December 15, 1980 informed Ms. Groudine and appellants of Brezenoff's efforts to dissuade stores from carrying the product. Ms. Groudine then attempted to obtain a copy of Brezenoff's letter by telephoning his office. She identified herself as an investigative journalist but was not permitted to speak with Brezenoff. After telephoning a freedom of information officer of the City of New York, Groudine received through the mails a copy of the correspondence she desired in February of 1981. On February 27, 1981, Pramschufer appeared on the Barry Farber radio show where he first had the chance to inspect Brezenoff's letter.

On May 20, 1981, Pramschufer, Johnson and Hammerhead Enterprises initiated this action against Brezenoff acting in his individual and official capacity, against the Mayor and the City Council of New York, and against the City itself. Appellants alleged the various defendants had violated their First Amendment rights. They also argued the Brezenoff letter was libelous, defamatory, and tortiously interfered with contractual relations. Jurisdiction was claimed pursuant to 28 U.S.C. § 1343 (jurisdictional counterpart of 42 U.S.C. § 1983) and 28 U.S.C. § 1332 (diversity).

During the course of litigation, appellants received, in September 1981, a list of the department stores to which Brezenoff had mailed the challenged letter. Thereafter,

Hammerhead Enterprises was successful in persuading both Brentano's and F.A.O. Schwarz to carry the game for the 1981 Christmas season. Fifty-five thousand Public Assistance games were sold during 1981, primarily through small retail outlets.

A bench trial was held before Judge Pollack between September 28 and September 30, 1982. At the close of trial, the district judge dismissed the complaint against all defendants except Brezenoff since no evidence was presented that they had participated in his decision to send the letter. On December 6, 1982, Judge Pollack also rejected appellants' claims against Brezenoff. Judge Pollack found Brezenoff acted in good faith when he attempted to persuade stores not to carry appellants' controversial game. The court also determined that Brezenoff's letter was "an appeal to conscience and decency" and in no way constituted illicit censorship. In addition, Judge Pollack concluded the Brezenoff letter was neither libelous nor defamatory since it was merely a statement of accurate facts and an expression of Brezenoff's personal opinion. Accordingly, the district court, 551 F.Supp. 1360, dismissed the complaint in its entirety. Pramschufer, Johnson, and Hammerhead Enterprises appeal.

## II

### A. *First Amendment Claim*

We have emphasized that "[courts] must remain profoundly skeptical of government claims that state action affecting expression can survive constitutional objections." *Thomas v. Board of Education, Granville Central School District*, 607 F.2d 1043, 1047 (2d Cir.1979), *cert. denied*, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980). Even the most penetrating examination of Brezenoff's actions, however, reveals no violation of appellants' First Amendment rights. Instead, the record indicates that Brezenoff's request to New York department stores to refrain from carrying Public Assistance was nothing more than a well-reasoned and sincere entreaty in support of his own political perspective. And, although we share Judge Pollack's view that the letter was "an ap-

peal to conscience and decency," Brezenoff's pleas would have been equally immune from appellants' challenge had they been based on the views of a society which this or any court found wholly repugnant. *See Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308–1309, 1 L.Ed.2d 1498 (1957) ("unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of [constitutional] guarantees.")

■ Appellants invoke the spectre of government censorship. The record before us, however, shows this claim to be little more than a figment of appellants' collective imagination. We agree that, under certain circumstances, oral or written statements made by public officials will require courts to draw fine lines between permissible expressions of personal opinion and implied threats to employ coercive state power to stifle protected speech.[6] Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated. Similarly, claimants who can demonstrate that the distribution of items containing protected speech has been deterred by official pronouncements might raise cognizable First Amendment issues. *See Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).[7] We have already noted, however, appellants cannot establish that this case involves either of these troubling situations.

■ Appellants' efforts to fit this case under the rubric of *Bantam Books, Inc. v.*

*Sullivan, supra,* are entirely unsuccessful. In that case, the Rhode Island Commission to Encourage Morality in Youth, whose practices were invalidated by the Supreme Court, had explicit statutory authority to recommend prosecution of distributors of books and magazines who continued to display publications the Commission deemed objectionable for sale to individuals under 18 years of age. In addition, the Court accepted the state court's finding that distributors had ceased stocking protected communications after being intimidated by the Commission's official notices. By contrast, Brezenoff's letter refers to no adverse consequences that might be suffered by stores selling Public Assistance games, nor does the HRA have the power to impose sanctions on merchants who did not respond to Brezenoff's requests.[8] Moreover, the evidence indicates that not a single store was influenced by Brezenoff's correspondence. The challenged communication, therefore, was simply not part of an "informal system of censorship." *Bantam Books, Inc. v. Sullivan, supra,* 372 U.S. at 71, 83 S.Ct. at 640.

Appellants' contention that Brezenoff's actions were unconstitutionally shrouded in secrecy is similarly without merit. The First Amendment does not require public officials to communicate only through the media, and Judge Pollack wisely found Brezenoff acted in good faith when he wrote the department stores directly. Brezenoff also promptly complied with Ms. Groudine's freedom of information request for a copy of the letter, and his refusal to speak with her on the telephone is hardly probative of an effort to hide his attempt to persuade merchants not to carry Public As-

---

6. Since appellants have failed to establish any constitutional violation, we need not address the competing First Amendment considerations of Brezenoff's own right to speak.

7. Appellants' inability to prove that Brezenoff's letter could reasonably be viewed as threatening or that any one was in fact intimidated by his correspondence makes it unnecessary for us to determine whether the former, the latter, or both showings are requisite elements of a First Amendment violation.

8. Appellants suggest that Brezenoff somehow engaged in "follow-up action" when he mailed

a copy of the challenged letter to Edward Weaver, executive director of the American Public Welfare Association. The contention that merely writing to a private party constituted a government conspiracy to censor the controversial game is as spurious as it appears. Equally frivolous is appellants' reliance on fire inspections performed during the Christmas season of 1980. Appellants have demonstrated no connection whatever between these inspections and Brezenoff's activities. *See* note 5 *supra.*

sistance. Accordingly, we find Brezenoff did not violate appellants' First Amendment rights by sending the November 5, 1980 letter.[9]

### B. *Libel*

Appellants' libel claim is based upon a fundamental misconception. They ask this Court to find defamatory Brezenoff's statement that the stores' cooperation in keeping Public Assistance off the shelves would be a genuine public service. From appellants' perspective, the suppression of public views is contrary to the spirit of our democracy and can therefore never be in the public interest. Accordingly, they argue Brezenoff's position is false and, since it was intended to impugn the integrity of those who designed the game, defamatory.

■ Whether or not we agree with Brezenoff's opinion concerning the societal value of the appearance of Public Assistance in department stores, this Court's role is not to pass judgment on the validity of his point of view. It is well settled that the Constitution does not permit the imposition of liability for expressing so-called "false ideas." *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–340, 94 S.Ct. 2997, 3006–3007, 41 L.Ed.2d 789 (1974). Similarly, New York law protects the expression of "even erroneous opinion" against libel suits. *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 383, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). These salutary principles stem from the basic premise that a free people must depend upon the competition of conflicting ideas, and not the wisdom of judges, to arrive at the ultimate truth. Ironically, appellants would undermine the very principle they champion, by limiting Brezenoff's right to expound his belief that Public Assistance should not be circulated. The First Amendment contains no such limitation.

■ Moreover, nothing in Brezenoff's entire statement may be held libelous under prior rulings of this Court. The majority of appellee's letter sets forth facts concerning the operation of New York's welfare system and the accuracy of these assertions is not challenged in this litigation. The remainder of Brezenoff's exhortation merely reflects his view, based on these uncontested facts, that appellants' game is distasteful and damaging. This expression of opinion, however controversial, cannot form the basis for a libel judgment. *See Edwards v. National Audubon Society, Inc., supra,* 556 F.2d at 121; *Buckley v. Littell,* 539 F.2d 882 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977); *Hotchner v. Castillo-Puche,* 551 F.2d 910 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).[10]

### C.

Having carefully examined appellants' additional claims, we find them to be entirely without merit.[11] Appellants ask this

---

**9.** Appellants also raise vague allegations of impermissible "infringement" of their right to speak. As we set forth in the text, we find nothing unconstitutionally odious in Brezenoff's conduct. This case does not involve an indirect *restriction* on appellants' exercise of political rights. *Cf. Bates v. Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 416–417, 4 L.Ed.2d 480 (1960) (invalidating local ordinance requiring disclosure of names of members in local NAACP since this "would work a significant interference with . . . freedom of association"). Rather, appellants are being "forced" only to endure a conflict with Brezenoff's own political views.

**10.** Since we conclude Brezenoff's letter was not libelous, we need not consider whether appellants would be required to comport with the "actual malice" standard of *New York Times v.* *Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) or the "gross irresponsibility" standard set forth in *Chapadeau v. Utica Observer Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975). We also need not determine whether Brezenoff's remarks were protected by an absolute or qualified privilege pursuant to the principles of *Clark v. McGee,* 49 N.Y.2d 613, 427 N.Y.S.2d 740, 404 N.E.2d 1283 (1980).

**11.** The district judge correctly determined appellants failed to show any participation by other City officials in Brezenoff's decision to send the letter. Since we find Brezenoff committed no compensable injury, the other defendants cannot be liable under the doctrine of respondeat superior.

Court to award them damages for injury they have not proved and to immunize them from criticism they have shown no reluctance to inflict on others. We decline to do so. Accordingly, the judgment of the district court is affirmed.