Sheila **WATTERS**, Individually and as Administratrix, Estate of Johnny Burnett, Deceased, Plaintiff,

v.

**TSR, INC.**, a/k/a TSR Hobbies, Inc., Defendant.

Civ. A. No. C88–0298(P)(J).

United States District Court.
W.D. Kentucky,
Paducah Division.

May 31, 1989.

---

are having adventures. The abilities and characteristics of each character consist of numerical values assigned to areas of strength, intelligence, dexterity, constitution, wisdom and charisma. The game characters participate in one or more adventures during the game as described in the various books and manuals published by Defendant. These adventures are narrated and orchestrated by one game participant known as the Dungeon Master. The results of various encounters between characters are determined by using dice and the tables provided in the D & D publications.

Plaintiff casts her son as a "devoted" player of Dungeons & Dragons, who became totally absorbed by and consumed with the game to the point that he was incapable of separating the fantasies played out in the game from reality. She states that as a result of his participation in a D & D game "he lost control of his own independent will and was driven to self-destruction." Complaint at 2.

Plaintiff claims that TSR breached its duty to her son by negligently publishing and distributing D & D game materials, or in the alternative, by failing to warn "mentally fragile" persons such as decedent of the possible dangerous consequences of playing D & D.

TSR has moved to dismiss the complaint, on the grounds that its publication of D & D manuals and games are privileged under the first amendment's guarantee of freedom of speech. In the alternative TSR argues that it owed no duty to Plaintiff's son and that decedent's suicide was an intervening superseding cause of death, breaking the chain of causation.

Charles A. Saladino, Paducah, Ky., for plaintiff.

Stephen E. Smith, Jr., McMurray & Livingston, Paducah, Ky., for defendant.

## MEMORANDUM OPINION

JOHNSTONE, Chief Judge.

Plaintiff Administratrix brings this wrongful death action against Defendant, the publisher and manufacturer of the game "Dungeons & Dragons," on the theory that Defendants' alleged negligence is responsible for her son's suicide.

"Dungeons & Dragons" (D & D) is a role-playing game in which players use their imaginations in a fictional medieval world where they pretend their characters

## THE FIRST AMENDMENT

The first amendment is indeed implicated in this case where Plaintiff seeks an award of damages based on the content or effect of TSR's publication. An imposition of liability on TSR for the suicide of Plaintiff's son would have as much and perhaps more of an inhibiting impact on its future publications than fear of prosecution under a criminal statute. *New York Times Com-*

*pany v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The infrequency with which courts have allowed encroachments upon the right to speak or express one's viewpoint reflects the cherished place the right of self expression holds in our society. "The right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. This freedom embraces the right to distribute literature." *Martin v. City of Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (Black, J.) (citations omitted). "The safeguarding of these rights to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion is essential to free government." *Thornhill v. Alabama,* 310 U.S. 88, 95, 60 S.Ct. 736, 740, 84 L.Ed. 1093.

■■■ The amendment protects the publication of books, magazines, newspapers, and motion pictures, *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); and its guarantees are applicable to state action under the fourteenth amendment's due process clause. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The amendment's protection is not limited to political expression or comment on public affairs. *Time, Inc. v. Hill,* 385 U.S. 374, 388, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967). The first amendment's protection is broader than that. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. State of Alabama, supra* 310 U.S. at 102, 60 S.Ct. at 744 (1940). "No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and impor-

tance of the ideas seeking expression." *Bridges v. State of California,* 314 U.S. 252, 269, 62 S.Ct. 190, 196, 86 L.Ed. 192 (1941). Whether the publication is sold for a profit has no bearing on the amount of protection to which the first amendment entitles it. *Joseph Burstyn Inc., supra* 343 U.S. at 501, 72 S.Ct. at 780.

■■■ Under these principles, the publication and distribution of the "Dungeons and Dragons" material, whether it is classified as literature or merely a game, falls within the class of publication which is generally afforded protection under the first amendment. In *Hammerhead Enterprises, Inc., v. Brezenoff,* 707 F.2d 33 (2d Cir.1983) the court held that a game satirizing public assistance programs was entitled to first amendment protection. This protection extends to publications such as "Dungeons and Dragons," whether they are disseminated for the purpose of informing the public or merely for providing entertainment. *Winters v. People of State of New York,* 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

Mrs. Watters' objection to the D & D game is that it exerted some type of mind control over her son, eventually resulting in his withdrawal from society and his domination by the D & D concept. The essence of her objection to the game involves both the content of the game and the effect which it allegedly had on her son. Restrictions based on the content of speech and those based on injuries caused by speech must meet separate analytical criteria. *See* L. Tribe, American Constitutional Law § 12–2 (2d ed.1988).

### A. Content-based Restrictions

■■■ The general rule with regard to restrictions aimed at the content of a particular speech or publication is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content...." *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–2290, 33 L.Ed.2d 212 (1972). The first amendment extends protection to materials even though they may offend the sensibili-

ties or tastes of some or a majority of members of society. *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). Generally the "choice, between the dangers of suppressing information and the dangers of its misuse if it is freely available" is one which "the First Amendment makes for us." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976). This rule applies just as strongly where the restriction occurs subsequently through a tort action as where speech is deterred because of a criminal statute. *See New York Times, supra.*

In order to survive scrutiny under the first amendment a content-based restriction "must be a precisely drawn means of serving a compelling state interest." *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980).

▆▆▆ The theories of liability sought to be imposed upon the manufacturer of a role-playing fantasy game would have a devastatingly broad chilling effect on expression of all forms. It cannot be justified by the benefit Plaintiff claims would result from the imposition. The libraries of the world are a great reservoir of works of fiction and nonfiction which may stir their readers to commit heinous acts of violence or evil. However, ideas expressed in one work which may drive some people to violence or ruin, may inspire others to feats of excellence or greatness. As was stated by the second Mr. Justice Harlan, "one man's vulgarity is another man's lyric." *Cohen v. California*, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). Atrocities have been committed in the name of many of civilization's great religions, intellectuals, and artists, yet the first amendment does not hold those whose ideas inspired the crimes to answer for such acts. To do so would be to allow the freaks and misfits of society to declare

what the rest of the country can and cannot read, watch, and hear.[1] The court's statements in *Zamora v. Columbia Broadcasting System*, 480 F.Supp. 199, 205 (S.D. Fla.1979) in the context of television programming is even more apt when first amendment protection for publications is concerned. "[The] right of the public to have broad access to programming and the right of the broadcaster to disseminate should not be inhibited by those members of the public who are particularly sensitive or insensitive." *Id.* (Citations omitted).

The first amendment safeguards the freedom of individuals to express themselves in their own way and leaves to the individual receiving their message the decision whether to accept or reject, emulate or ignore. As Mr. Justice Brandeis stated:

> Those who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty.... Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears.

*Whitney v. California*, 274 U.S. 357, 375–76, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (Brandeis, J., concurring).

The first amendment prohibits imposition of liability on TSR based upon the content of the game "Dungeons and Dragons."

### B. *Restrictions Aimed at Noncommunicative Impact*

▆▆ Although the D & D publications come within the range of material protected by the first amendment, the right of free speech is "not absolute at all times

---

**1.** Despite Plaintiff's arguments to the contrary, it follows that TSR is not required to place any warning directed to "mentally fragile" persons on the D & D publications. Because the first amendment protects TSR from liability based

on the content of the publication, it likewise cannot constitutionally be required to warn its readers of possible consequences of reading or playing the game materials.

and under all circumstances." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Certain classes of speech are subject to limitation under the first amendment, including obscenity, *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); "fighting words," *Chaplinsky, supra;* defamatory invasions of privacy and libel, *See New York Times v. Sullivan* and *Time, Inc., v. Hill, supra;* and words "likely to produce or incite imminent lawless action." *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Only in these particular classes of cases has the right of freedom of speech been found to be inferior to the interests of society in limiting such speech.

The reason that speech is unprotected in these cases flows naturally from the philosophy behind the first amendment's prohibition on content-based restrictions on speech. The public and the concept of freedom are better served if the ideas expressed in a speech or publication are left to thrive or perish in the open marketplace of public or personal debate rather than by having their message controlled or eradicated by a state censor. *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., joined by Brandeis, J., dissenting).

In each of the unprotected types of speech, the speech itself either creates an injury or "tends to incite an immediate breach of the peace." *Chaplinsky, supra* 315 U.S. at 571–72, 62 S.Ct. at 768–69. Generally the first amendment requires that dangerous ideas be exposed for what they are through the give and take of public discussion or by the listener's intuition. The negative impact such ideas may have on society are remedied through application of "more" speech, not by censorship. In the words of Thomas Jefferson: "We have nothing to fear from the demoralizing reasonings of some, if others are left free to demonstrate their errors and especially when the law stands ready to punish the first criminal act produced by the false reasonings; these are safer corrections than the conscience of the judge."[2] Because in certain instances, "more" speech cannot undo the injury which the "bad words" have caused or there is no time for "more" speech, such speech may be prohibited before it is uttered or punished afterwards.

■ It is clear from the record that the D & D publications do not fall into one of these unprotected classes of speech. The very manner in which the D & D game allegedly injured Plaintiff's son resolves all doubts as to whether the game is unprotected by the first amendment.

Plaintiff does not assert that her son was injured after playing "Dungeons and Dragons" one time or even after a few times. Rather, she asserts that his injury occurred after five years of playing the game. The basis for not protecting the types of speech listed is not applicable where the injury does not *immediately* result from the speech itself[3] or where the speech does not "incite imminent violence and such violence is likely to occur." *See Brandenburg, supra.*

The injury alleged here is one which can be prevented by "more" speech. The rationale for denying first amendment protection applicable in cases of obscenity, fighting words, libel, and incitement to violence, is absent.

A similar claim was also rejected by the court in *Zamora v. Columbia Broadcasting System*, 480 F.Supp. 199 (S.D.Fla.1979). There the plaintiffs claimed that their son had become addicted to the violent programs broadcast by the three major networks resulting in his desensitization to

**2.** Cited in the concurring opinion of Mr. Justice Brandeis in *Whitney v. California, supra* 274 U.S. at 375 n. 3, 47 S.Ct. at 648 n. 3.

**3.** Although under Plaintiff's pleadings it could be argued that each time decedent played D & D he was incrementally or subliminally injured, where the injury alleged is so uncertain, the rationale for not protecting "words that wound" is absent. A holding which would eliminate first amendment protection for this type of injury would have the effect of dissolving any distinction between content-based restrictions and restrictions based on the non-communicative impact of speech.

violent behavior and his killing an 83–year old woman. *Id.* at 200. The court held the general complaint of continuous exposure insufficient to fall within one of the unprotected classes of speech. *Id.* at 204.[4]

Because the first amendment shields TSR from liability for the death of Plaintiff's son, it is unnecessary to address Defendant's tort-based defenses.

For the reasons stated above Defendant TSR's motion for summary judgment is GRANTED.

---

**4.** Several cases addressed in Defendant's brief illustrate instances where persons have been injured after reading books or watching a television program or a movie. In each case the court held there to be insufficient "incitement" to justify denying first amendment protection. *See DeFilippo v. National Broadcasting Co., Inc.,* 446 A.2d 1036 (R.I.1982) (where the plaintiff's son hanged himself after watching a stunt performed on "The Johnny Carson Show"); *Olivia N. v. National Broadcasting Co., Inc.,* 126 Cal. App.3d 488, 178 Cal.Rptr. 888 (1982) (where the plaintiff was raped with a bottle by juveniles allegedly acting upon the stimulus of observing an "artificial rape" scene in a television drama); *Walt Disney Productions, Inc., v. Shannon,* 247 Ga. 402, 276 S.E.2d 580 (1981) (where a child was injured trying to reproduce a sound effect demonstrated on a television program by rotating a BB inside an inflated balloon).

The injuries in each of these cases present a stronger claim for redress under the "incitement" theory than that of Plaintiff. In each case, however, the court held the broadcast to be protected by the first amendment.