**Michael ZIEPER, Mark Wieger, Becamation, Plaintiffs– Appellants,**

v.

**Joseph METZINGER, Lisa Korologos, Defendants–Appellees.**

**Docket No. 05–5250–cv.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 17, 2006.

Decided: Jan. 19, 2007.

Aden J. Fine (Christopher A. Hansen and Scott Michelman, on the brief), American Civil Liberties Union Foundation, New York, N.Y., for Plaintiffs–Appellants.

Sara L. Shudofsky (Neil M. Corwin and Sarah S. Normand, on the brief), for Michael Garcia, United States Attorney for the Southern District of New York, New York, N.Y., for Defendants–Appellees.

Elena M. Paul, Ronald M. Daignault, Sami J. Valkonen, New York, N.Y., for Amicus Curiae Volunteer Lawyers for the Arts.

Before: KEARSE, SOTOMAYOR, KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

This case arises out of the efforts of the Federal Bureau of Investigation and the United States Attorney's Office for the Southern District of New York to remove from the internet a video that they may have believed posed a danger to the public safety. We are called upon to determine, first, whether the defendants are entitled to summary judgment on their contention that their actions did not violate the First Amendment rights of the video's filmmaker and distributor and, second, whether the plaintiffs-appellants' claims are nonetheless barred by the doctrine of qualified immunity. We hold that although the defendants are not entitled to summary judgment on their First Amendment argument, they are entitled to qualified immunity. The decision of the district court is affirmed.

## I.

The pertinent facts, undisputed for the purposes of this motion, are as follows.

In October 1999, plaintiff-appellant Michael Zieper placed on the internet a short film he had written, directed, and produced called "Military Takeover of New York City." In the film, viewers see various shots of Times Square as an unseen narrator, who purports to be a military officer, briefs other members of the military about plans for a military takeover of Times Square on New Year's Eve 1999. The website included this text as an introduction to the film:

> Is there going to be a Military Takeover of New York City on New Years Eve 1999? I don't know too much about this tape you are about to see. I got it from my cousin Steve who's in the army. He said that copies of this tape are floating around the base, and nobody knows who made it. If it's fake, then there's nothing to worry about. If it's real, then we're in really big trouble.

Zieper rented space for the film from BECamation, a web hosting service run by plaintiff-appellant Mark Wieger. Wieger rented his internet space from a company called Online Marketing, LLC ("OLM"), which in turn rented its space from GTE Internetworking ("GTE"). Zieper also publicized his film by posting information about it on a number of internet sites. On none of these sites did Zieper indicate whether the work was fictional.

On November 8, 1999, the New York Police Department ("NYPD") faxed information about the film to the FBI's Joint Terrorism Task Force. Patrick Fitzgerald, then-Co-Chief of the Organized Crime and Terrorism Unit of the U.S. Attorney's Office for the Southern District of New York, watched the film with Pasquale D'Amuro, then-FBI Assistant Special Agent in Charge of the Counterterrorism Branch of the New York Office, and concluded that the video was a work of fiction. He also determined that they could ask that it be removed from the internet, although they could not order its removal. Fitzgerald explained this to D'Amuro, who told defendant Joseph Metzinger, one of the FBI agents assigned to work on the case, that he should try to have it removed, but that all that he could do was make a request.

On November 9, 1999, the U.S. Attorney's Office served a grand jury subpoena on GTE to obtain information about Zieper's website. From GTE's response, the office learned that GTE rented the space to OLM, which in turn rented it to Wieger. The next day, Metzinger went to Zieper's home in West Caldwell, New Jersey with two NYPD officers and an officer from the local West Caldwell force. Because Zieper was not at home when they arrived, they left and returned later in the evening. When they returned at approximately 7 p.m., Zieper was still not at home, so they called his home telephone number and reached an answering machine, which provided his pager number. The West Caldwell police officer paged Zieper, and when Zieper returned the call, the police officer told him that he was outside his home with FBI agents who wanted to speak with him and wanted to know when he would be home. Zieper told the officer he would not be returning home that night, and the call ended. No mention was made of the video.

Metzinger then paged Zieper, and when Zieper returned this second page, Metzinger told him that he was an FBI agent and that he and the other officers were at his home because of the website and film. The two spoke for approximately five minutes, during which time Metzinger told Zieper he was trying to find out about the

film and asked him where he had gotten it. He also told him that it might upset people who were coming to New York and that it would have a negative effect on people's plans and local businesses. Finally, he told him that people were asking the FBI about the video, and he asked him if there was any way the FBI could prevent people from seeing the tape. Zieper was not particularly forthcoming during the phone call, but told Metzinger he would call him back the next day. Zieper also said he did not think it was possible to stop people from seeing the video because it was going to be aired on a local news station that evening. When Metzinger asked if Zieper could call the station to request that they not air the story, Zieper said that he did not think he could stop it, but perhaps Metzinger could.

Zieper did not call Metzinger back the next day, so Metzinger left a voice mail message for Zieper, who had his attorneys return the phone call. The attorneys told Metiznger that the film was fictional and expressed their view that Metzinger was violating the First Amendment in pursuing Zieper. Although the lawyers offered to meet with Metzinger, Metzinger declined to meet with them or to discuss the matter further. When one of the lawyers expressed the hope that "it's over," Metzinger reported that it was not over. Metzinger told the lawyers that more FBI agents were on their way to Zieper's home and that he could not stop them. Notwithstanding that comment, Metzinger did, in fact, stop the officers once he got off the phone with Zieper's attorneys.

Four days later, on November 15, 1999, Metzinger and Lisa Korologos, the Assistant United States Attorney assigned to the case, placed a joint call to Wieger.

Wieger later recalled that they identified themselves as working in the U.S. Attorney's Office and the FBI office handling "riot control or something along those lines," and they asked him if he owned the website on which the video was hosted. Wieger explained that he did not own the site, but merely hosted it,[1] and that he had been told that the film in question was a work of fiction. Korologos responded that the film was serious, and Metzinger explained that they were afraid that the video was going to incite a riot. Together, they explained that their job was to stop a riot and that they wanted to get the video offline, so that people would no longer be able to see it. They told Wieger that they had traced the website to him through contact with OLM and GTE and that "if [he didn't] pull the site down," GTE would. They also told Wieger that they had been in contact with Zieper and Zieper's lawyers, that they had asked Zieper to take down the website, and that he had refused. Wieger later recalled that he asked the defendants if he was "in trouble," but he could not recall whether either responded. During the course of the call, Korologos asked Wieger if he would block access to the site. Wieger asked if that was what they wanted him to do, and she said yes. Wieger agreed and blocked access to the site while they were all on the phone. The conversation lasted approximately 15–20 minutes.

Later that day, the parties spoke again. This time, Wieger called Korologos back to make sure that he had done everything she wanted him to do. She asked whether anyone could still see the site, and he explained that it would still be possible for someone to see it. She then asked how it would be possible to keep everyone from

---

1. Wieger rented his space on the internet from OLM and its upstream provider GTE, but as the website host, he was responsible for the technical creation of the site that featured Zieper's video.

seeing the site, and he explained that the only way to do that would be to remove all the files. When he asked whether she wanted him to do that, she said yes, and he removed the files. He then suggested that they should tell Zieper that he had removed the files, but she told him it was not necessary to do so. Neither Metzinger nor Korologos had any further contact with either Zieper or Wieger after this phone call. On November 26, 1999, Wieger again made the video accessible on the website, and no law official agent contacted him about taking it down.

On December 22, 1999, plaintiffs brought suit in the United States District Court for the District of New Jersey against the following individuals in their official capacities: then-Attorney General Janet Reno, then-United States Attorney for the Southern District Mary Jo White, then-FBI Director Louis Freeh, Metzinger, and Korologos. Plaintiffs also sued Metzinger and Korologos in their individual capacities, seeking unspecified damages. The district court granted the defendants' motion to dismiss the declaratory and injunctive claims on standing grounds, *see Zieper v. Reno*, 111 F.Supp.2d 484, 491 (D.N.J.2000), and transferred the only remaining claims—claims against Metzinger and Korologos in their individual capacities for violations of the plaintiffs' First and Fifth Amendment rights—to the Southern District of New York, *id.* at 492. Metzinger and Korologos moved to dismiss on qualified immunity grounds.

In June 2002, the district court denied this motion on the ground that discovery was necessary, *see Zieper v. Reno*, 00 Civ. 5594(RMB), 2002 WL 1380003, 2002 U.S. Dist. LEXIS 11421 (S.D.N.Y. June 26, 2002), and this Court affirmed in pertinent part, *see Zieper v. Metzinger*, 62 Fed. Appx. 383 (2d Cir.2003). Following discovery, the defendants moved for summary judgment,[2] and the district court granted this motion. *Zieper v. Metzinger*, 392 F.Supp.2d 516 (S.D.N.Y.2005). It concluded that no reasonable jury could find that Metzinger's contact with Zieper amounted to threats or coercion in violation of the First Amendment, but that there was a triable issue of fact on the issue of coercion as to the conversation with Wieger. *Id.* at 530, 532. The district court then determined that plaintiffs' claims were nonetheless barred by the doctrine of qualified immunity because reasonable officers could have disagreed about the legality of the defendants' actions. *Id.* at 539.

We now affirm. Although we disagree that a reasonable jury could not have found that Metzinger's conversations with Zieper and his attorneys gave rise to a First Amendment violation, we hold that the plaintiffs' claims are barred by the doctrine of qualified immunity.

## II.

We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving parties and drawing all reasonable inferences in their favor. *See, e.g., Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir.1999).

### A.

It is well-established that "First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech." *Aebisher v. Ryan*, 622 F.2d 651, 655 (2d Cir.1980). Accordingly, the First Amendment prohibits government officials from encouraging the suppression of speech in a manner which "can reasonably

---

**2.** Following remand, the case was reassigned to Judge P. Kevin Castel.

be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir.1983). In determining whether a particular request to suppress speech is constitutional, what matters is the "distinction between attempts to convince and attempts to coerce." *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir.2003) (per curiam).

Because the district court found that no triable issue of fact existed on the question of whether the defendants' conduct toward Zieper violated the First Amendment, we must determine whether a juror could reasonably find that the defendants, in their repeated communications with Zieper and his attorneys, engaged in activity that could reasonably be interpreted as intimating that some form of punishment would follow his failure to accede to their request. The district court determined that a juror could not reach this conclusion primarily because Metzinger "spoke in a tone that was facially polite and non-threatening," and "nothing in Metzinger's words to Zieper refer[red] to criminal statutes or legal consequences, or mirror[red] the language of a criminal violation." *Zieper*, 392 F.Supp.2d at 528–29.

■ While the precise language and tone that Metzinger used is certainly important, we have never held that it is the only relevant factor in determining whether a public official has crossed the line "between attempts to convince and attempts to coerce." *Okwedy*, 333 F.3d at 344; *see, e.g., id.* at 343 ("[T]he existence of regulatory or other direct decisionmaking authority is certainly relevant to the question of whether a government official's comments were unconstitutionally threatening or coercive. . . ."); *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir.1991) (not-

ing that "a threat was perceived and its impact was demonstrable"); *Hammerhead Enters.*, 707 F.2d at 39 (holding that there was no First Amendment violation where a ("letter refer[red] to no adverse consequences that might be suffered by stores[,] . . . the [entity sending the letter had no] power to impose sanctions on merchants who did not respond[,] . . . [and] not a single store was influenced by [the] correspondence") (internal footnote omitted)). Instead, it is necessary to consider the entirety of the defendants' words and actions in determining whether they could reasonably be interpreted as an implied threat. *Cf. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (explaining the need to "look through forms to the substance" of the defendant's actions).

Here, Zieper received a call from an FBI agent informing him that he and other police officers were outside his home and wanted to speak with him about his video. The agent informed him that the FBI was concerned about the video and wanted to know if there was any way they could prevent people from seeing it. At no time did the agent make clear that Zieper's actions were lawful or that he would not face consequences for making the video public. The next day, Zieper's attorneys spoke to Metzinger and made clear that their client had no intention of removing the video and that they viewed his actions as a First Amendment violation. When the lawyers nonetheless offered to meet with him, Metzinger refused their offer to talk. Instead, when they expressed the hope that this was over, he told them it was not and that more FBI agents were on the way to Zieper's house and that he could not stop them.

■ Although the police may not have expressly told Zieper or his attorneys that he faced punishment for his actions, their

decision to send not only an FBI agent, but also three police officers, to his home before even speaking with him could have reasonably suggested to someone in Zieper's position that there might be legal consequences if he failed to accede to the government's request that he remove his video. So, too, could the fact that the government officials repeatedly called him, twice in quick succession the first evening and then again the next day, even though he had told them he would call them. *See Rattner,* 930 F.2d at 210 (suggesting that "unannounced visits by police personnel" might be relevant in determining whether the defendants' actions could be reasonably viewed as an implicit threat); *see also Bantam Books, Inc.,* 372 U.S. at 68–69, 83 S.Ct. 631 (noting the fact that the defendant's notices were "invariably followed up by police visitations" as one factor that was relevant in determining that the notices "serve as instruments of regulation"); *cf. Rattner,* 930 F.2d at 209–10 (noting that the letter was not simply a "plea" because, in part, it "stated that the recent Gazette raises *significant* questions and concerns") (emphasis added; internal quotation marks omitted). Likewise, after Zieper's attorneys firmly told Metzinger that they viewed the officials' actions as violations of the First Amendment, a reasonable juror could conclude that Metzinger's efforts to "convince" Zieper to take down the video had failed and that his claims that the FBI agents were heading to Zieper's home, that he could not stop them from going to Zieper's home, and that this was not over, were an attempt to "coerce" Zieper into doing so. Thus, we hold that a rational juror could conclude that the officers' actions and comments could reasonably be interpreted as an attempt to coerce Zieper into removing his film from the internet,

and we believe that the district court erred in holding to the contrary.[3]

**B.**

■■■ Defendants argue that even if they are not entitled to summary judgment on the plaintiffs' First Amendment claims, they are nonetheless entitled to qualified immunity. Under the doctrine of qualified immunity, governmental actors are "shield[ed] ... from suits for damages ... unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Roach,* 165 F.3d at 142. To determine whether qualified immunity is appropriate, we must first determine whether the facts alleged, taken most favorably to plaintiffs, demonstrate a violation of a constitutional right. *See, e.g., Papineau v. Parmley,* 465 F.3d 46, 55 (2d Cir.2006). Having already determined that they do, we must turn to the second prong of the qualified immunity analysis and determine whether the defendants' actions violated clearly established constitutional rights of which a reasonable person would have known. *See, e.g., Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Papineau,* 465 F.3d at 55. This determination must "be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Thus, the fact that the general proposition that the First Amendment prohibits "implied threats to employ coercive state power to stifle protected speech," *Hammerhead Enters.,* 707 F.2d at 39, is well-established does not end our inquiry. Rather,

> the right the official is alleged to have violated must have been "clearly estab-

---

**3.** The district court found that a triable issue of fact existed with respect to plaintiffs' First Amendment claims arising from the officers' contact with Wieger, and the government does not challenge that determination on this appeal.

lished" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal citations omitted).

■ At the time of defendants' actions, it was well-established that the defendants could " 'exhort[ ]' private entities" to remove speech so long as they did not engage in "any threat, coercion, or intimidation" when doing so. *X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 70 (2d Cir.1999) (quoting *Hammerhead Enters.,* 707 F.2d at 37). Thus, it was clearly lawful for defendants to request that plaintiffs remove from the internet a video which they may have believed posed a danger to the public safety.[4] However, in making this request, the defendants were forced to walk a difficult line: They could lawfully explain why the government was concerned about the video and request its removal, so long as none of their statements or actions might reasonably be interpreted as coercive. In walking this line, much of what the defendants here did was unobjectionable: They were free to contact both plaintiffs, to explain that the government was concerned about the video's effect on the general public, and to request that plaintiffs remove it from the internet. However, as we held above, a reasonable juror could conclude that some of the defendants' actions here did cross the sometimes fine line between an "attempt[ ] to convince and [an] attempt[ ] to coerce." *Okwedy,* 333 F.3d at 344.

Notwithstanding our conclusion that a reasonable juror could find a First Amendment violation, under our case law, the defendants are entitled to qualified immunity if it would not have been clear to a reasonable officer in their position that their conduct was unlawful. *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 ("The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful . . . ."); *see also Hope v. Pelzer,* 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (stating that for a right to be clearly established for qualified immunity purposes, it "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" (quotation marks omitted)).

Here, our pre-existing law would not have made apparent to a reasonable officer that defendants' actions crossed the line between an "attempt[ ] to convince and [an] attempt[ ] to coerce" because the cases in which we have held that individuals' First Amendment rights were violated involved conduct more likely to be perceived as threatening than that here. In *Bantam Books,* the threats issued were much more explicit than those in the present case. There, a state commission notified a publication distributor that some of the publications he distributed had been "reviewed . . . and . . . declared [to be] . . . completely objectionable for sale, distribu-

---

**4.** Appellants argue that the district court erred in ignoring record evidence that defendants acted solely because they did not like the film's content. However, the defendants' motives are irrelevant to whether their ac-

tions "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Hammerhead Enters.,* 707 F.2d at 39.

tion or display for youths." *Bantam Books, Inc.,* 372 U.S. at 62, 83 S.Ct. 631 n. 5. The notice further stated that "[t]he Chiefs of Police have been given the names of the aforementioned magazines with the order that they are not to be sold, distributed or displayed to youths [under] eighteen years of age. . . . The Attorney General will act for us in case of non-compliance." *Id.* A separate notice also threatened prosecution: "Your cooperation in removing the listed and other objectionable publications . . . will be appreciated. Cooperative action will eliminate the necessity of our recommending prosecution to the Attorney General's department." *Id.* at 63, 83 S.Ct. 631 n. 5.

Likewise, in *Rattner,* the threat of a commercial boycott constituted a more direct economic sanction than the one contemplated here and, thus, required fewer and simpler inferences to discern. There, the defendant, a member of the Village of Pleasantville Board of Trustees and the mayor's "right-hand man," sent a letter to the Village Chamber of Commerce in which he expressed concerns about the Chamber's publication of an advertisement that detailed on-going litigation between the plaintiff and the Village and charged the Village with hiding the costs of that litigation from taxpayers. *Rattner,* 930 F.2d at 206. The defendant and others complained to Chamber members about the decision to publish the advertisement, and defendant wrote a letter to each member of the Chamber, other than plaintiff. In the letter, the defendant expressed his belief that the advertisement's "inclusion in a Chamber paper was and is inappropriate and a disservice to those of us who live here and have been strong supporters of our local businesses." *Id.* He also indicated that "[t]he healthy growth of many local businesses depends on the trust and honesty displayed by our local businesses. . . . I believe—and many of my

neighbors believe—that the recent *Gazette* raises significant questions and concerns about the objectivity and trust which we are looking for from our business friends." *Id.* At a debate among candidates for Village Trustee approximately three weeks later, the defendant "stated that he had made a list of approximately 40 local businesses at which he regularly shopped," thereby strongly suggesting that he might launch an economic boycott of those businesses. *Id.; see also id.* at 210 ("Several Chamber directors testified at their depositions that they viewed the letter as reminiscent of McCarthyism, threatening them with boycott or discriminatory enforcement of Village regulations if they permitted the publication of additional statements by Rattner. . . .").

Thus, the language in those cases was more likely to be perceived as threatening than was the defendants' conduct in this case. When Metzinger spoke to Zieper, he merely told him that the video might upset people who were coming to New York and that it might have a negative effect on people's plans and local businesses and asked him if there was any way the FBI could prevent people from seeing the tape. *See, e.g., Hammerhead Enters.,* 707 F.2d at 36–37 n. 2 (finding no First Amendment violation when the Administrator of the New York City Human Resources Administration urged that stores not sell a board game because it was an "ugly and damaging slam at this society's poorest citizens" and "does a grave injustice to taxpayers and welfare clients alike"). Indeed, when Zieper told Metzinger that he could try to have the local news affiliate not run a story about the video, Metzinger might have taken that as a sign that Zieper was willing to consider removing the video and, thus, that further attempts to contact him would not be viewed as coercive. While we hold that Metzinger's comments to Zieper's at-

torneys the following day that this was "not over" could, in the circumstances here, reasonably have been interpreted as coercive, Metzinger only stated this in response to the attorneys' expressed hope that the matter was over, and Metzinger could have reasonably believed that his statement would be interpreted only as an informative response to the attorneys' statement.

Likewise, although the district court held that Korologos' statement to Wieger about his upstream provider's willingness to remove the video could reasonably be interpreted as threatening economic sanctions, Korologos, unlike the defendant in *Rattner*, never indicated that she understood the potential economic significance to Wieger of his relationship with the upstream provider, or suggested that she was using their alleged prior contact to gain leverage. *See Rattner*, 930 F.2d at 206 (citing official's letter which noted that the "healthy growth of many local businesses depends on the trust and honesty displayed by our local businesses"). Korologos could have believed that this statement would reasonably be interpreted as only informative. Indeed, at oral argument, appellants' counsel acknowledged that one reasonable inference of Korologos' statement was that she was simply making a factual assertion.

The district court also held that "[g]iving plaintiffs the benefit of every reasonable inference on this motion, ... a reasonable jury could find that the statement [that Zieper's video might 'incite a riot'] was coercive" because it is similar to language in a criminal statute. *Zieper*, 392 F.Supp.2d at 531. However, defendants here are entitled to qualified immunity because an officer could reasonably believe

that this language would be interpreted as simply an explanation of why they were concerned about the video and not a threat of prosecution under the criminal statute. The defendants' statements and conduct fall considerably short of the thinly veiled threats of prosecution issued in *Bantam Books*.[5] In *Bantam Books*, the Commission sent out multiple notices, which were "phrased virtually as orders," reminded the recipients "of the Commission's duty to recommend to the Attorney General prosecution of purveyors of obscenity," were circulated to local police departments, and were "invariably followed up by police visitations." *Bantam Books*, 372 U.S. at 62–63, 68, 83 S.Ct. 631. Thus, because *Bantam Books* and *Rattner* present examples of threats that are more direct on their face than those defendants used here, these cases were not "closely analogous" enough to the circumstances here to give the defendants' fair warning of the illegality of their actions. *See Lauro v. Charles*, 219 F.3d 202, 215–16 (2d Cir.2000).

Appellants express concern that extending qualified immunity to the officials here will effectively immunize government officials from liability whenever they use ambiguous threats to suppress protected speech, but this fear is unwarranted. There will certainly be some cases in which the totality of the circumstances are such that a reasonable officer would have to recognize that his or her requests could reasonably be interpreted as threatening. All we hold today is that the defendants' actions here do not present such a case. Moreover, as a result of our holding that a reasonable juror could conclude that the defendants' actions violated the First Amendment, officials who are in a similar situation in the future will be on notice

---

**5.** In *Rattner*, threats of criminal prosecution were not an issue, because the threats were economic in nature. 930 F.2d at 210.

that they must be especially careful to make sure that the totality of their actions do not convey a threat even when their words do not.

 As the Supreme Court has recognized, civil suits for damages "can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties," and "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly" believe that their actions are lawful. *Anderson*, 483 U.S. at 638, 641, 107 S.Ct. 3034. Even if it is somewhat more difficult to sue public officials in the specific context of implied threats to speech than in other contexts, this result is hardly surprising: The very purpose of qualified immunity is to protect officials when their jobs require them to make difficult on-the-job decisions. *See, e.g., Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued.") (quoting *Davis v. Scherer*, 468 U.S. 183, 196, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). This is especially true when officials are forced to act quickly. Here, the defendants knew the video was about to be publicized on a local news station, and reasonable officials could have feared that the video would cause more damage as its notoriety spread and more people saw it. *See, e.g., Laverne v. Corning*, 522 F.2d 1144, 1149 (2d Cir.1975) (noting that "qualified immunity is based on the common-sense rationale that the public interest requires that public officials be able to carry out their discretionary duties and act deci-

sively without the intimidation that would result if good-faith errors in judgment were later to subject them to liability for damages"). In any event, the qualified immunity standard " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter*, 502 U.S. at 229, 112 S.Ct. 534 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Even viewing the evidence most favorably to the plaintiffs, we cannot say here that these defendants did more than make a "mistaken judgment[ ]" about what precisely they could say in the context of requesting that Zieper's video be removed from the internet, and we cannot hold that a reasonable official in the defendants' circumstances would necessarily have understood that his or her actions were unlawful. Thus, the defendants are entitled to qualified immunity.[6]

## III.

Accordingly, the opinion of the district court is **AFFIRMED**.

---

**6.** Plaintiffs also assert procedural and substantive due process claims under the Fifth Amendment, but because we hold that defendants could have believed that their contacts with plaintiffs were lawful, they are entitled to

qualified immunity not only from plaintiffs' First Amendment claims, but also from any separate Fifth Amendment claims plaintiffs might have. *Cf. Colson v. Grohman*, 174 F.3d 498, 514 (5th Cir.1999).