Michael ZIEPER, Mark Wieger, and Becamation, Plaintiffs,

v.

Janet RENO, in her official capacity as Attorney General of the United States, Louis Freeh, in his official capacity as Director of the Federal Bureau of Investigation, Mary Jo White, in her official capacity as United States Attorney for the Southern District of New York, Joseph Metzinger, individually and in his official capacity as Special Agent for the Federal Bureau of Investigation, and Lisa Korologos, individually and in her official capacity as Assistant United States Attorney for the Southern District of New York, Defendants.

No. Civ.99–5980(DRD).

United States District Court, D. New Jersey.

July 20, 2000.

As Amended Aug. 14, 2000.

Lenora Lapidus, John C. Salyer, American Civil Liberties Union of New Jersey Foundation, Newark, New Jersey, Ann Beeson, Christopher A. Hansen, American Civil Liberties Union Foundation, New York City, for plaintiffs.

Robert J. Cleary, United States Attorney, by Michael A. Chagares, Assistant United States Attorney, Newark, New Jersey, Mary Hampton Mason, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendants.

## *OPINION*

DEBEVOISE, Senior District Judge.

Plaintiffs filed this civil rights action against the above-named government defendants, alleging violations of their First and Fifth Amendment rights to freedom of speech and procedural and substantive due process. Plaintiffs seek damages as well as injunctive and declaratory relief. Four motions are presently pending before the Court.

Alleging an ongoing violation of their rights, plaintiffs moved for leave to conduct expedited discovery in this matter. Plaintiffs' motion was granted and defendants moved for reconsideration of that order or for a stay of discovery pending resolution of their motion to dismiss. Defendants' motion for reconsideration has since been withdrawn as moot, but they maintain their request for a stay of discovery. Because defendants' motions to dismiss are resolved by this opinion, the motion for a stay of discovery pending

resolution of those motions will be dismissed as moot.

As for the motions to dismiss, all of the defendants move to dismiss the complaint on the grounds of lack of standing and failure to state a cause of action. Defendants Lisa Korologos and Joseph Metzinger, sued individually and in their official capacities, have filed additional motions to dismiss asserting certain defenses personal to them. For the reasons set forth below, defendants' motions to dismiss the official capacity claims will be granted. Because the court lacks personal jurisdiction over defendant Korologos, the remaining claims will be transferred to the United States District Court for the Southern District of New York for further proceedings.

## STATEMENT OF FACTS

On a motion to dismiss, all allegations set forth in the complaint must be accepted as true and all reasonable inferences must be drawn in the plaintiff's favor. *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991). Thus, the following facts are drawn from plaintiffs' complaint.

Plaintiff Michael Zieper is an independent filmmaker who lives in West Caldwell, New Jersey. He is the creator of a fictional short film titled "Military Takeover of New York City", consisting of daytime footage of Times Square accompanied by a voice-over of an actor portraying a military officer who debriefs other officers on a planned military takeover of the city on New Year's Eve ("the Film"). The Film is intentionally framed in a realistic style, with nothing to indicate that it is a fictional dramatization. The purpose of the Film, according to the complaint, was to raise issues about the then-upcoming millennium, Americans' distrust of government, and the use of racial hatred to manipulate the American people.

Plaintiff Mark Wieger lives in Edwardsburg, Michigan, and is the owner of a web hosting company, plaintiff BECamation.[1] Exhibition of movies on the Internet provides small filmmakers with an affordable alternative to other methods of distribution. After producing the film, Zieper contacted Wieger to arrange for placement of the Film on the Internet. Internet users were then able to view the Film by visiting a web site at *http://www. crowdedtheater.com*, which included an e-mail address, *fire@crowdedtheater.com*, for users who wanted to contact the film maker. The web site included a message stating:

> Is there going to be a military takeover of New York City on New Year's Eve 1999? I don't know too much about this tape you are about to see. I got it from my cousin Steve who's in the army. He said that copies of this tape are floating around the base, and nobody knows who made it. If it's a fake, then there's nothing to worry about. If it's real, then we're in really big trouble.

Exhibition of the Film began on October 28, 1999, and it became the subject of several online discussion groups. The interest generated resulted in a television news story about the Film, including an interview with Zieper, which aired on UPN Channel 9 in the New York metropolitan area on November 10, 1999.

That same evening, Zieper, who was away from home, received a telephone call on his pager. When he returned the call, it was answered by a police officer who stated that he was standing at the door of Zieper's home in West Caldwell with agents from the Federal Bureau of Investigation. The agents, the police officer informed Zieper, wanted to speak with him about the Film. Zieper offered to call the next day to arrange a meeting with the FBI agents.

Zieper received a second page that evening from defendant Joseph Metzinger, a

---

1. As described in the complaint, BECamation arranges for the placement of material on the Internet, but does not own the web site itself. BECamation leases Internet space for its clients from third parties.

special agent with the Federal Bureau of Investigation. Metzinger explained that the FBI had received several calls about the Film from concerned citizens and businesses, and asked Zieper where he had obtained the video tape. At this point, Zieper decided to seek legal advice and asked Metzinger if he could return his call the following day. Metzinger agreed to this request, but asked if there was a way to prevent people from viewing the Film in the meantime. Zieper then mentioned the news story, and Metzinger asked Zieper to call the television station to stop the story from running.

The following day, Zieper consulted with attorneys and did not return the call to Metzinger. Metzinger left two messages, asking why Zieper had not called. Zieper's attorneys later called Metzinger, who told them that FBI agents had again been dispatched to Zieper's home. Over the next several days, Justice Department officials publicly stated that they were conducting an ongoing investigation into Zieper's activities.

Plaintiff Wieger received a call from Metzinger and defendant Lisa Korologos several days later, on November 15, 1999. They asked whether Wieger was the owner of the web site, and explained that they had traced the site to him through his business contacts. They further informed him that they had asked Online Marketing, the business from whom Wieger had leased the web site, to take the web site down if Wieger was unwilling to do so. Wieger asked whether they wanted him to block public access to the Film, and they said yes. Wieger complied with this request by disabling the link to the Film on the web site.

Wieger later called Korologos to ensure that he had complied with the request. He explained that he had disabled the link but that the Film could still be viewed by anyone who knew the exact web site address for the Film. Korologos asked whether the Film could be completely removed from the Internet. Wieger said

that he would delete all of the files and remove the web site from his server, thereby preventing access to the Film and the web site entirely.

In their complaint, plaintiffs contend that these incidents resulted from "Project Megiddo," a Justice Department initiative to investigate and prosecute lawless actions, threats of lawless action, and incitement to lawless actions related to the arrival of the millennium. They contend that the policy or practice defined by Project Megiddo is so broad and vague that it permits the suppression of constitutionally protected speech.

## STANDARD OF REVIEW

A complaint may be dismissed pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted if the court finds "beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In analyzing a motion to dismiss, all allegations set forth in the complaint must be accepted as true and all reasonable inferences must be drawn in the plaintiff's favor. *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991). A court should allow a plaintiff to amend the complaint instead of dismissing it where "a more carefully drafted complaint might state a claim upon which relief could be granted." *Friedlander v. Nims*, 755 F.2d 810, 813 (11th Cir. 1985); *see Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984).

## DISCUSSION

### A. Official Capacity Claims

Plaintiffs assert claims for declaratory and injunctive relief against each of the defendants in their official capacity. Specifically, plaintiffs are requesting an order:

1) declaring that the Film is protected by the First Amendment;

2) declaring that the defendants' actions violated plaintiffs' First and Fifth Amendment rights;

3) enjoining defendants from taking any further action to suppress the Film;

4) declaring that the policy or practice of defendants in taking actions that suppress constitutionally protected speech violates the First and Fifth Amendments, and;

5) enjoining defendants from continuing any policy or practice of taking actions that suppress constitutionally protected speech, including on the Internet.

In moving to dismiss plaintiffs' complaint, defendants begin by challenging plaintiffs' standing to obtain this relief.

Standing is a constitutionally-based jurisdictional doctrine grounded in the case-or-controversy requirement of Article III of the Constitution. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "If there is no justiciable case or controversy, the federal court is divested of jurisdiction and may not consider the case." *Neiderhiser v. Borough of Berwick*, 840 F.2d 213, 216 (3d Cir.1988). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 120 S.Ct. 693, 706, 145 L.Ed.2d 610 (2000).

■ At a minimum, a plaintiff seeking to invoke federal jurisdiction must establish three elements as an indispensable part of his or her case. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130; *Friends*, 120 S.Ct. at 704. Each of these requirements must be supported with the same manner and degree of evidence required at the successive stages of the litigation. *Lujan* at 561, 112 S.Ct. 2130. " 'When standing is challenged on the basis of the pleadings,' as it is here, we must 'accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party.' " *Hospital Council v. City of Pittsburgh*, 949 F.2d 83, 86 (3d Cir.

1991), *quoting Pennell v. City of San Jose*, 485 U.S. 1, 7, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988); *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A plaintiff must show: 1) he or she has suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical; 2) the injury is fairly traceable to the challenged action of the defendant, and; 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends*, 120 S.Ct. at 704; *citing Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

■ It is the first of these requirements that is primarily at issue in this case. While there is little doubt that plaintiffs could establish standing with regard to their claims for damages, a plaintiff seeking prospective relief must be able to show real and immediate threat of future injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210–11, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lyons* at 102, 103 S.Ct. 1660, *quoting O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). In *Lyons*, for example, the plaintiff alleged he had been subjected to the use of an illegal choke hold during his arrest by the Los Angeles Police. *Id.* at 97–98, 103 S.Ct. 1660. In addition to seeking damages for his injuries, plaintiff sought injunctive relief barring the use of choke holds in the future. *Id.* at 98, 103 S.Ct. 1660. The Court rejected plaintiffs' standing to seek such an injunction, holding the possibility that Lyons would again be arrested and might again be subjected to a choke hold was simply too remote to establish a present case or controversy. *Id.* at 105–06, 103 S.Ct. 1660. *Compare Pena*, 515 U.S. at 212, 115 S.Ct. 2097 (finding real and immediate threat of future harm estab-

lished where contractor challenging use of subcontractor compensation clauses showed that defendant let at least one contract containing a subcontractor compensation clause each year and that contractor bid on all contracts let by defendant).

For the declaratory and injunctive relief plaintiffs seek regarding the Film, they cannot establish a credible threat of future harm. The investigation of the Film by defendants has ended, and defendants do not intend to initiate any prosecution with regard to the Film. *See* Declaration of Alan R. Kaufman at ¶ 3; Declaration of Pasquale J. D'Amuro at ¶ 3. Where an allegedly unconstitutional investigation has come to a close, "[t]o pass judgment on its legality would be to render an advisory opinion unless there were current consequences." *Committee in Solidarity with the People of El Salvador v. Sessions*, 929 F.2d 742, 744 (D.C.Cir.1991). "Current or future harm serves to keep the controversy alive." *Id.*

As for the relief sought in regards to defendants' alleged policy or practice of investigating constitutionally protected speech, *Lyons* is dispositive of plaintiffs' standing to seek prospective relief. Even assuming, as the Court must on a motion to dismiss, that such a policy exists, plaintiffs have no standing to challenge it absent "a realistic threat from the policy." *Friends*, 528 U.S. at ——, 120 S.Ct. at 705, 145 L.Ed.2d at 629.

The most that plaintiffs can offer in terms of demonstrating such a threat is their speculation that if, in the future, they produce and distribute a film (in the case of Zieper) or arrange for the exhibition of a film (in the case of Wieger) which offends the alleged policy, they might again be subjected to unconstitutional investigation. Zieper can only offer his assurance that "I intend to engage in similarly provocative and controversial films in the future." Declaration of Michael Zieper at ¶ 4. Wieger, in similar fashion, declares

that "I intend to continue to host similarly provocative and controversial speech in the future." Declaration of Mark Wieger at ¶ 4. The Supreme Court has explicitly held that "[s]uch 'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564, 112 S.Ct. 2130 (emphasis in original). Furthermore, the only specific information about the policy provided in the complaint alleges that "Project Megiddo" is a Justice Department initiative to investigate and prosecute lawless actions, threats of lawless action, and incitement to lawless actions related to the arrival of the millennium. The new millennium having safely arrived some six months ago, and the investigation into plaintiffs' activities having already terminated, it seems highly unlikely that the government would have any further interest in the kind of films plaintiffs produce or display. *See Presbytery of N.J. v. Florio*, 40 F.3d 1454, 1463 (stating that to obtain declaratory relief, there must be a substantial threat of real harm and that the threat must remain real and immediate throughout the course of the litigation; where intervening events remove the possibility of harm, the court must not address the now-speculative controversy).

In any event, neither plaintiff can demonstrate that his future activities would necessarily attract defendants' attention. Plaintiffs' situation does not present the type of "shadow or threat" of unfavorable government treatment found in *Hospital Council v. City of Pittsburgh*, where plaintiff hospitals that failed to comply with the requests of the governmental defendants were assured that they *would* have their tax exempt status challenged, *would* be likely to run into difficulties in obtaining zoning approvals, and *would not* be offered the opportunity to provide services to the defendants. 949 F.2d at 85. Plaintiffs, as in *Lyons*, would have to "make the incredi-

ble assertion" that defendants *always* investigate *every* instance of provocative and controversial speech. 461 U.S. at 106, 103 S.Ct. 1660. "Absent a sufficient likelihood that [a plaintiff] will again be wronged in a similar way ... a federal court may not entertain a claim by any or all citizens that certain practices of law enforcement officers are unconstitutional." *Id.* at 111, 103 S.Ct. 1660. *See also Allen v. Wright,* 468 U.S. 737, 760, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (stating that, absent a specific threat of being subject to the challenged practices, a federal court is not the proper forum to press general complaints about the way in which government goes about its business).

Plaintiffs argue that a different result should obtain in cases alleging violation of First Amendment rights, because of the possible chilling effect on free expression. *See* plaintiffs' brief at 24–25. It is not a specific threat of prosecution that chills them, they maintain, but the very existence of the policy itself. In so arguing, plaintiffs analogize from cases involving facial challenges to overbroad statutes regulating First Amendment activities, such as *Broadrick v. Oklahoma:*

> [i]t has long been recognized that the First Amendment needs breathing space ... as a corollary, the Court has altered its traditional rules of standing to permit—in the First Amendment area ... litigants ... to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction that the statute's very existence may cause others not before the Court to refrain from constitutionally protected speech or expression.

413 U.S. 601, 611–12, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). *See also Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (plaintiffs had standing to challenge statute where they alleged an actual and well-founded fear that the law would be enforced against them); *Mallick v. International Brotherhood of Elec. Workers,* 644 F.2d 228, 235 (3d Cir.1981) (union members had standing to challenge provision in union constitution prohibiting certain statements by union members because of the chilling effect created by a vaguely worded prohibition of speech). The Supreme Court has indeed recognized that an inherent danger of overbroad statutes is "one of self-censorship; a harm that can be recognized even without an actual prosecution." 484 U.S. at 393, 108 S.Ct. 636. Plaintiffs suggest that this doctrine be expanded to include similarly overbroad policies or practices by law enforcement agencies which may have a chilling effect on free expression.

Regardless of whether plaintiffs' argument is theoretically plausible, it has already been rejected by the Supreme Court. Indeed, this case closely resembles *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), in which a group of plaintiffs challenged the Army's surveillance of and collection of material about public activities that were thought to have at least some potential for civil disorder. Plaintiffs complained, much as plaintiffs do here, that "the present existence of this system of gathering and distributing information ... exercises a present inhibiting effect on their full expression and utilization of their First Amendment rights." *Id.* at 10, 92 S.Ct. 2318. The Supreme Court held that "a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose" lacks standing to seek prospective relief in federal court. *Id.* at 10, 92 S.Ct. 2318. Even in the First Amendment context, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13–14, 92 S.Ct. 2318. *Compare Presbytery of N.J. v. Florio,* 40 F.3d 1454, 1468 (3d Cir.1994)

(finding real and substantial threat of prosecution where a state statute arguably could be applied to plaintiff's religiously-motivated speech, and the state pointedly refused to forswear prosecution of religiously motivated speakers). Because plaintiffs lack the requisite standing to pursue their claims against defendants in their official capacities, those claims must be dismissed.

### B. Individual Capacity Claims

Plaintiffs also assert claims for damages against defendants Korologos and Metzinger in their individual capacities. *See Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Korologos and Metzinger move to dismiss these claims, raising several personal defenses in addition to the general arguments raised in the government's brief.

Before delving into the merits of the individual defenses, it is necessary to examine the personal jurisdiction defense raised by Korologos. Jurisdiction to resolve cases on the merits requires authority over both the subject matter of the litigation and the parties, and without jurisdiction the court cannot proceed. *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 119 S.Ct. 1563, 143 L.Ed.2d at 766–67 (1999). "Because Bivens suits are suits against government officials in their individual, rather than their official capacities," personal jurisdiction over the individual defendants is necessary to maintain a Bivens claim." *Howard v. United States,* 2000 WL 128701, *1 (E.D.Pa. Jan. 24, 2000), citing Delgado v. Federal Bureau of Prisons,* 727 F.Supp. 24 (D.D.C.1989); *Lawrence v. Acree,* 79 F.R.D. 669, 670 (D.D.C.1978).

A federal district court may assert personal jurisdiction over a nonresident defendant to the extent permitted by the law of the state in which the court is located, Fed.R.Civ.P. 4(e)(1), and New Jersey's long-arm statute provides for personal jurisdiction over nonresidents to the fullest extent permitted by due process. *See*

N.J.Civ.R. 4:4–4(b)(1); *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 284 (3d Cir.1981). Determining whether an assertion of personal jurisdiction will offend due process requires a two-step analysis. First, the court must determine whether the defendant has purposefully established minimum contacts with the forum state, such that she could reasonably anticipate being haled into court there. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *see also Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Once it has been established that a defendant has sufficient contacts with the forum state, those contacts "may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King,* 471 U.S. at 476–77, 105 S.Ct. 2174 (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

■ Plaintiffs' complaint fails to establish a sufficient connection between Korologos and this forum. As plaintiffs recognize, "defendant Lisa Korologos is an Assistant United States Attorney for the Southern District of New York." Complaint at ¶ 14. A review of the allegations in the complaint shows that she had no contact with New Jersey; each of the allegations made in regard to Korologos' conduct involves her communications with plaintiff Wieger, who resides in Michigan.

Plaintiffs maintain that personal jurisdiction over Korologos is proper under the "effects test" set forth by the Supreme Court in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). They argue that "by coercing Wieger" into removing the Film from the Internet, Korologos purposefully caused injury to Zieper within New Jersey. *See* plaintiffs' brief at

36. New Jersey has, in some circumstances, found personal jurisdiction over a defendant on the basis of a single contact having an effect in New Jersey, based on the strong interest in protecting New Jersey residents from injury due to the actions of an out-of-state defendant. *Starline Optical Corp. v. Caldwell,* 598 F.Supp. 1023, 1025 (D.N.J.1984). Conduct which has an effect in New Jersey by itself, however, is not enough to sustain personal jurisdiction. *Calder* has been limited to those situations where a plaintiff "can point to contacts which demonstrate that the defendant expressly aimed its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity." *IMO Indus. v. Kiekert AG,* 155 F.3d 254, 265 (3d Cir.1998). "The mere allegation that the plaintiff feels the effect of the defendant's tortious conduct in the forum because the plaintiff is located there is insufficient to satisfy *Calder.*" *Id.* Compare *Molnlycke Health Care AB v. Dumex Med. Surgical Prods., Ltd.,* 64 F.Supp.2d 448 (E.D.Pa.1999) (finding no personal jurisdiction in Pennsylvania over Canadian defendant who allegedly infringed the patent of a Pennsylvania company); *with Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119 (W.D.Pa.1997) (finding personal jurisdiction in Pennsylvania over California defendant in trademark infringement and dilution suit, but only where defendant had contracted for business with Pennsylvania residents and the cause of action arose out of those contracts).[2] There can be no dispute that Korologos did not direct her conduct towards New Jersey, regardless of where the effects of that conduct may have been felt.

■ Turning to Metzinger, he has waived any personal jurisdiction defense which may have been available to him by not raising it in his motion to dismiss. Fed.R.Civ.P. 12(h); *EF Operating Corp. v. American Bldgs.,* 993 F.2d 1046, 1048 (3d Cir.1993). Thus the court could proceed to address the merits of his personal defenses. Both individual defendants are, however, subject to personal jurisdiction in the Southern District of New York. Both defendants are employed there, and most if not all of the evidence relating to plaintiffs' claims will likely be found in that district. Further proceedings in the Southern District would provide a more convenient forum for the defendants and for relevant witnesses, and would not impose an undue burden on the plaintiffs in this case. In addition, conservation of judicial resources would not be served by the maintenance of parallel proceedings against the individual defendants in two different forums. For all of these reasons, transfer of this action pursuant to 28 U.S.C. § 1631 appears appropriate and in the interest of justice. *See Carty v. Beech Aircraft Corp.,* 679 F.2d 1051, 1065–66 (3d Cir.1982); *Valdivia v. INS,* 80 F.Supp.2d 326, 333 (D.N.J. 2000).

The remaining defenses raised by Metzinger have also been raised by Korologos. Moreover, the claims against these defendants arise from a common set of facts. In light of the decision to transfer jurisdiction to the Southern District of New York, it would be imprudent for this Court to resolve the merits of those defenses as they pertain to Metzinger. Resolution of the merits in regards to both individual defendants should be left to the transferee court.

### *CONCLUSION*

For the reasons set forth above, defendants' motions to dismiss the claims against them in their official capacities are

---

**2.** Contrary to plaintiffs' suggestion, the *IMO* holding does not expressly limit itself to the context of business torts. The "three principal findings" relied on in *Calder,* none of which draw a distinction between personal injuries and business injuries, are the same three considerations considered relevant by the *IMO* court. *See* 155 F.3d at 261, 265. In addition, the Third Circuit suggested that "it is questionable judicial policy to apply a different jurisdictional rule to individuals than to corporations." 155 F.3d at 265, n. 9.

granted, and their motion for a stay of discovery is dismissed as moot. The remaining claims against defendants Korologos and Metzinger in their personal capacities will be transferred to the Southern District of New York for further proceedings. An appropriate order will be entered.